1  DAVID M. WALSH (CA SBN 120761)
   DWalsh@mofo.com
2  KAI S. BARTOLOMEO (CA SBN 264033)
   KBartolomeo@mofo.com
3  MORRISON & FOERSTER LLP
   707 Wilshire Boulevard
4  Los Angeles, California  90017-3543
   Telephone: 213.892.5200
5  Facsimile: 213.892.5454

6  TIFFANY CHEUNG (CA SBN 211497)
   TCheung@mofo.com
7  MORRISON & FOERSTER LLP
   425 Market Street
8  San Francisco, California  94105-2482
   Telephone:  415.268.7000
9  Facsimile:  415.268.7522

10 Attorneys for Defendant
   APPLE INC.
11

12              UNITED STATES DISTRICT COURT

13             NORTHERN DISTRICT OF CALIFORNIA

14                    SAN JOSE DIVISION

15

16 ADAM BACKHAUT, BOUAKHAY JOY          Case No.   5:14-cv-02285 LHK
   BACKHAUT, and KENNETH MORRIS, on
17 behalf of themselves and all others similarly    **CLASS ACTION**
   situated,
18                                         **DEFENDANT APPLE INC.'S**
                   Plaintiffs,            **NOTICE OF MOTION AND**
19                                         **MOTION FOR SUMMARY**
           v.                              **JUDGMENT; MEMORANDUM OF**
20                                         **POINTS AND AUTHORITIES IN**
   APPLE INC.,                             **SUPPORT THEREOF**
21
                   Defendant.
22                                         Date:    December 3, 2015
                                           Time:    1:30 p.m.
23                                         Place:   Courtroom 8 – 4th Floor
                                           Judge:   Hon. Lucy H. Koh
24
                                           Complaint Filed:  May 16, 2014
25                                         FAC Filed:  December 10, 2014
                                           Trial Date:  May 9, 2016
26

27         **SUBMITTED UNDER SEAL - REDACTED VERSION**

28

1  **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2  TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

3  PLEASE TAKE NOTICE THAT on December 3, 2015, at 1:30 p.m., or as soon thereafter

4  as the matter may be heard, in the Courtroom of the Honorable Lucy H. Koh, located at the

5  Robert F. Peckman Federal Building, 280 South First Street, Fifth Floor, San Jose, California,

6  Defendant Apple Inc. ("Apple") will, and hereby does, move the Court for summary judgment,

7  pursuant to Federal Rule of Civil Procedure 56, against Plaintiffs Adam Backhaut, Bouakhay Joy

8  Backhaut, and Kenneth Morris.

9  This motion is based on this Notice of Motion and Motion, the accompanying

10  Memorandum of Points and Authorities, and the Declarations of Tiffany Cheung, Jeffery

11  Kohlman, and Justin Wood in support thereof, and other related documents filed in connection

12  with this motion, the papers and records on file in this action, and such other written and oral

13  argument as may be presented to the Court.

14  Dated: August 7, 2015

DAVID M. WALSH
TIFFANY CHEUNG
15  KAI S. BARTOLOMEO
MORRISON & FOERSTER LLP
16

17

By: */s/ David M. Walsh*
18  DAVID M. WALSH

19  Attorneys for Defendant
APPLE INC.
20

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ..................................i

TABLE OF AUTHORITIES ....................................................................................... iv

ISSUES TO BE DECIDED ........................................................................................... 1

I. INTRODUCTION AND SUMMARY OF ARGUMENT .................................... 1

II. FACTUAL AND PROCEDURAL BACKGROUND........................................... 1

    A. iMessage: What Is It, And How Does It Work? ........................................ 1
    B. Plaintiffs' Experience and Allegations...................................................... 3

        1. Adam and Joy Backhaut........................................................... 3
        2. Kenneth Morris ...................................................................... 4

    C. Apple's Intent: Efforts to Improve iMessage and Fix ████████ .......... 6

        1. Apple's iMessage Deregistration Methods ................................. 6

            a. Turning iMessage Off ................................................ 6
            b. ████████████████ ................................................ 6
            c. Apple's Auxiliary Deregistration Tools.......................... 7
            d. ██████████████████████████████████
                .......................................... 7

        2. ████████████████ .......................................................... 7

    D. Apple's Deregistration Methods Work ...................................................... 8

III. LEGAL STANDARD ................................................................................... 13

IV. ARGUMENT .............................................................................................. 14

    A. Apple Is Entitled to Summary Judgment on Plaintiffs' Wiretap Act Claim........ 14

        1. Plaintiffs Cannot Establish An "Interception" Under The Wiretap Act............................................................................... 14

            a. "Intercept" Is Narrowly Defined.................................. 14
            b. No Acquisition ......................................................... 14
            c. No Acquisition During Transmission ........................... 15

               (1) In Transit ..................................................... 15
               (2) In Storage .................................................... 16

            d. No Acquisition of the Contents of Any Text Messages............... 17

        2. Apple Did Not Use A "Device" To "Intercept" Electronic Communications ................................................................... 18
        3. No Intentional Interception ..................................................... 20

            a. Apple Created iMessage Deregistration Tools .............................. 20
            b. The Deregistration Methods Work................................. 22

B.   Apple Is Entitled To Summary Judgment on Plaintiffs' Entirely Derivative UCL Claim ........................................................................................... 24

C.   Apple's iOS Software License Agreement Bars Each of Plaintiffs' Claims ........ 24

1.   No Warranty of Compatibility; No Warranty That the Software and Services Will Be "Error Free." .................................................................. 24

2.   Limitation of Liability ........................................................................... 25

3.   Provisions Survive Post-Termination ..................................................... 25

V.   CONCLUSION ................................................................................................. 25

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**CASES**

4

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................ 13, 14

5

*Backhaut v. Apple, Inc.,*
6    ---F. Supp. 3d---, No. 14-CV-02285-LHK, 2014 WL 6601776
(N.D. Cal. Nov. 19, 2014) ............................................................................ 16

7

*Bunnell v. Motion Picture Ass'n of Am.,*
8    567 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................... 15, 17

9

*Fed. Trade Comm'n v. Publ'g Clearing House, Inc.,*
10    104 F.3d 1168 (9th Cir. 1997) ...................................................................... 14

11

*Glenn K. Jackson, Inc. v. Roe,*
273 F.3d 1192 (9th Cir. 2001) ...................................................................... 24

12

*Glob. Policy Partners, LLC v. Yessin,*
13    686 F. Supp. 2d 631 (E.D. Va. 2009) ........................................................... 15

14

*Hall v. EarthLink Network, Inc.,*
15    396 F.3d 500 (2d Cir. 2005) ............................................................. 16, 19, 20

16

*Ideal Aerosmith, Inc. v. Acutronic USA, Inc.,*
No. 07-1029, 2007 WL 4394447 (E.D. Pa. Dec. 13, 2007) .......................... 16

17

*In re Google Inc. Gmail Litig.,*
18    No. 13-MD-02430-LHK, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ............ 19

19

*In re Google, Inc. Privacy Policy Litig.,*
20    No. C 12-01382 PSG, 2012 WL 6738343 (N.D. Cal. Dec. 28, 2012) ................ 19

21

*In re iPhone Application Litig.,*
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ........................................................ 18

22

*In re Pharmatrak, Inc. Privacy Litig.,*
23    292 F. Supp. 2d 263 (D. Mass. 2003) ........................................................... 24

24

*In re Zynga Privacy Litig.,*
25    750 F.3d 1098 (9th Cir. 2014) ................................................................ 17, 18

26

*Konop v. Hawaiian Airlines, Inc.,*
302 F.3d 868 (9th Cir. 2002) ........................................................... 14, 15, 17

27

*Lasher v. City of Santa Clara,*
28    No. 5:10-cv-04173-LHK, 2012 WL 381208 (N.D. Cal. Feb. 6, 2012) ............ 13, 14

*Loucks v. Ill. Inst. Of Tech.*,
No. 12 C 4148, 2012 WL 5921147 (N.D. Ill. Nov. 20, 2012) ................................................ 24

*Marr v. Bank of Am.*,
No. C 09-05978 WHA, 2011 WL 845914 (N.D. Cal. Mar. 8, 2011) ..................................... 24

*Sanders v. Robert Bosch Corp.*,
38 F.3d 736 (4th Cir. 1994) ............................................................................................ 24

*Theofel v. Farey-Jones*,
359 F.3d 1066 (9th Cir. 2003) ..................................................................................... 15, 17

*United States v. Reed*,
575 F.3d 900 (9th Cir. 2009) ............................................................................................ 18

*Villiarimo v. Aloha Island Air, Inc.*,
281 F.3d 1054 (9th Cir. 2002) ......................................................................................... 14

**STATUTES & RULES**

Fed. R. Civ. P. 56 ............................................................................................................. 14

18 U.S.C. § 2510 ...................................................................................................... *passim*

18 U.S.C. § 2511 .......................................................................................................... 1, 14

1

## **ISSUES TO BE DECIDED**

2      1.   Whether summary judgment is proper on Plaintiffs' claim under the Wiretap Act because

3   Plaintiffs cannot prove that Apple "intercepted" any text messages using a "device."

4      2.   Whether summary judgment is proper on Plaintiffs' claim under the Wiretap Act because

5   Plaintiffs cannot prove that any interception by Apple was intentional.

6      3.   Whether summary judgment is proper on Plaintiffs' derivative claim under California's

7   Unfair Competition Law because Plaintiffs cannot prove a predicate violation of the Wiretap Act.

8      4.   Whether Apple's iOS Software License Agreement bars each of Plaintiffs' claims.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Apple Inc. moves for summary judgment on Adam Backhaut, Bouakhay Joy Backhaut,[1] and Kenneth Morris's ("Plaintiffs") remaining claims under the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* ("Wiretap Act" or "the Act") and California's Unfair Competition Law ("UCL").

- **Wiretap Act**:  The Wiretap Act prevents unlawful surveillance, eavesdropping, and other invasions of privacy — ***none*** of that is alleged here.  To prevail, Plaintiffs must prove that Apple ***intentionally*** "intercepted" their electronic communications using a "device."  18 U.S.C. §§ 2510(4), 2511(1)(a).  Plaintiffs cannot prove this claim because:  (1) there was no "interception" of messages or content; (2) there was no "device" as defined by the Wiretap Act; and (3) Apple did not act "intentionally."  In fact, the evidence shows the opposite.

- **UCL**:  Because Plaintiffs' UCL claim is completely dependent on their Wiretap Act claim, it cannot proceed.

### II.   FACTUAL AND PROCEDURAL BACKGROUND

#### A.   iMessage:  What Is It, And How Does It Work?

iMessage is a free text-based messaging service created by Apple for use on Apple devices.  (Declaration of Justin Wood in Support of Defendant Apple Inc.'s Motion for Summary Judgment ("Wood Decl.") ¶ 3.)  iMessage is an alternative to conventional text messaging (sometimes called "SMS" or "MMS").  (*Id.*)  SMS and MMS messages are routed through equipment and networks operated by wireless carriers (e.g., AT&T, Sprint, T-Mobile, Verizon).  (*Id.* ¶ 4.)  The carriers charge fees for their SMS and MMS services.  In contrast, iMessages bypass the carrier infrastructure altogether; iMessages are transmitted exclusively through Apple's own proprietary equipment and systems.  (*Id.* ¶ 5.)

---

[1] On May 13, 2015, five days before Joy Backhaut was scheduled to be deposed, Mrs. Backhaut informed Apple that she no longer wished to pursue her claims against Apple and intended to dismiss her claims.  (*See also* ECF No. 84.)

1   When an iPhone user starts an iMessage conversation, he first types the addressee's email

2   address or phone number into the Messages application on his iPhone.  (*Id.* ¶ 6.)  As soon as the

3   user enters the email or phone number, ███████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████████

5   ███████████████████████  (*Id.* ¶ 6; Declaration of Tiffany Cheung in Support of Defendant

6   Apple Inc.'s Motion for Summary Judgment ("Cheung Decl.") ¶ 7, Ex. 6 at 59:23-60:1.)[2]

7   ████████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████

9   ¶ 6.) ████████████████████████████████████████████████████

10  ██████████████████████████████████████████  (*See id.* ¶¶ 6-7.) ████████

11  ███████████████████████████████████████████████  (*Id.*)  This IDS

12  registration check is important because iMessages can be sent only between registered iMessage

13  users.

14   When a message is sent via iMessage, it is encrypted using *end-to-end* encryption.[3]  *No*

15  *one but the sender and receiver can see or read the message*.  (*Id.* ¶ 8; Cheung Decl. ¶ 6, Ex. 5 at

16  45:3-8.)  Apple cannot decrypt or review the contents of the message.  (Wood Decl. ¶ 8; Cheung

17  Decl. ¶ 7, Ex. 6 at 71:1-15.)

18

19  ───────────────────────

20  [2] ████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████

24  [3] "End-to-end" encryption means that messages are encrypted in a way that allows only
the recipient of a message to decrypt them.  "End-to-end" encryption prevents even the electronic

25  communication service carrying the message from accessing its content.  Wikipedia, "End-to-end
encryption," https://en.wikipedia.org/wiki/End-to-end_encryption (last visited July 10, 2015).  As

26  Apple explains on its website, "Apple has no way to decrypt iMessage and FaceTime data when
it's in transit between devices.  So unlike other companies' messaging services, Apple doesn't

27  scan your communications, and we wouldn't be able to comply with a wiretap order even if we
wanted to."  Apple Inc., "Privacy," https://www.apple.com/privacy/privacy-built-in/ (last visited

28  July 10, 2015).

1    Apple uses two services to transmit encrypted iMessages: ██████████████

2    ████████████████  (Wood Decl. ¶ 9.)  These services rely exclusively on Apple-created,

3    owned, and maintained software and equipment.  (*Id.*) ████████████████████████

4    █████████████████████████████████████████████████████████████████████

5    █████████████████████████████████████████████████████████████████████

6    █████████████████████████████████████████████████████████████████████

7    ████████  (*Id.*; Cheung Decl. ¶ 7, Ex. 6 at 28:17-21, 33:9-18.)

8    **B.    Plaintiffs' Experience and Allegations**

9         **1.    Adam and Joy Backhaut**

10   Adam Backhaut ("Mr. Backhaut") purchased an iPhone 5 in December 2012.  (First

11   Amended Class Action Complaint ("FAC") ¶ 39, Dkt. No. 29; Cheung Decl. ¶ 2, Ex. 1 at 155:11-

12   18.)  He switched to an HTC One on December 18, 2013 (Cheung Decl. ¶ 2, Ex. 1 at 123:2-15),

13   and switched back to his iPhone after approximately six weeks (*id.* at 71:5-24).  In August 2014,

14   Mr. Backhaut switched to a Samsung Galaxy.  (*Id.* at 124:10-14.)

15   Mr. Backhaut claims that ten iPhone/iMessage users (senders), including his wife, Joy

16   Backhaut ("Mrs. Backhaut"), attempted to send him messages that he did not receive.  (*Id.* ¶ 8,

17   Ex. 7 at 6-7.)  However, apart from his own testimony, he has no evidence to support his claim.

18   (*See id.* ¶ 2, Ex. 1 at 47:12-49:10, 183:3-6.)  Mr. Backhaut *might* have tried to prove his claim

19   using his wife's iPhone, but Mrs. Backhaut erased all the contents of her iPhone, including all

20   evidence of texts and iMessages her husband claims she sent to him.  (*Id.* ¶ 9, Ex. 8 at ¶¶ 4-5.)  In

21   fact, five months after she filed this lawsuit as a named plaintiff, Mrs. Backhaut traded in her

22   iPhone at a Best Buy store.  (*Id.*)  Mrs. Backhaut made no effort to preserve the contents of her

23   iPhone before trading it in, even though her iMessage record is a crucial part of her husband's

24   claim.  (*See id.* Ex. 8 at ¶¶ 5-7.)  Other than her recollection, Mrs. Backhaut has no evidence of

25   any of the text messages she allegedly sent to her husband.[4]  (*Id.* at ¶¶ 6-7.)

26   _____

27        [4] Although Apple made a discovery request for Mrs. Backhaut's iPhone on February 14,
     2014, Plaintiffs' counsel three months later claimed that the iPhone was irrelevant because
     Mrs. Backhaut would be dismissing herself from the case.  It was only after the Court granted
28   Apple's motion to compel Plaintiffs to produce Mrs. Backhaut's iPhone within 72 hours (June 10,

1    Mr. Backhaut no longer has his iPhone either.  He traded in his iPhone 5 at a Best Buy

2    store in August 2014, three months *after* filing this lawsuit.  (*Id*. ¶ 2, Ex. 1 at 52:22-53:18.)  He

3    does have his first replacement device, his HTC One, but that phone has been wiped clean of all

4    user data (including text messages), making it impossible for Apple's digital forensics expert to

5    confirm what messages he did and did not receive.  (*Id*. ¶ 10, Ex. 9 at ¶¶ 12-18.)  Apple's expert

6    advises that, based upon his analysis, it appears that the user data on Mr. Backhaut's HTC One

7    was erased sometime *after* December 2014, again, well after Mr. Backhaut filed this action.  (*Id*.

8    Ex. 9 at ¶ 5.)

9    Mr. Backhaut admits that he does not know why the messages he alleges were sent to him,

10   including SMS messages, were not delivered (*id*. ¶ 2, Ex. 1 at 91:24-92:1), whether the senders

11   had "send as SMS" toggled on or off on their phones (*id*. at 92:2-7, 187:24-188:4),[5] or whether

12   they were connected to wi-fi or cellular service when they sent the messages (*id*. at 91:3-11).  As

13   discussed below, iMessage deregistration works, and former iPhone/iMessage users have been

14   able to receive SMS messages from current iPhone/iMessage users after they switched.

15   ## 2.   Kenneth Morris

16   Kenneth Morris ("Mr. Morris") purchased his iPhone 5 in or around October 2012.  (FAC

17   ¶ 47; Cheung Decl. ¶ 3, Ex. 2 at 19:3-23:14.)  He "used iMessage on that iPhone 5."  (FAC ¶ 47;

18   Cheung Decl. ¶ 3, Ex. 2 at 34:14-20.)  Mr. Morris replaced his iPhone 5 with "an Android-based

19   phone" in March 2013.  (FAC ¶ 47; Cheung Decl. ¶ 3, Ex. 2 at 22:5-23:6.)  Like Mr. Backhaut,

20   he claims that he switched to a non-Apple device and that Apple's iMessage system subsequently

21   "intercepted" some of the text messages sent to him.  (FAC ¶ 49.)

22

---

23   2015 Minute Order (Dkt. No. 78)), that Plaintiffs' counsel informed Apple that Mrs. Backhaut no
     longer had the iPhone because she had traded it in to Best Buy eight months before.  (*See* Cheung

24   Decl. ¶ 9, Ex. 8 at ¶ 4.)

25   [5] Apple devices have a "Send as SMS" feature that can be toggled on or off in a device's
     settings.  (Wood Decl. ¶ 11.)  When "Send as SMS" is enabled, any iMessage that fails to deliver
     will automatically transmit that message as an SMS/MMS message over the carrier text

26   messaging architecture.  (*Id*.; Cheung Decl. ¶ 6, Ex. 5 at 77:7-16.)  The "Send as SMS" feature
     has existed on iPhones since iMessage first launched and can be turned "on" or "off" at the option

27   of the user at any time.  (Wood Decl. ¶ 11.)  iPhone users may turn "off" the "Send as SMS"
     feature to avoid unwanted SMS fees that would be charged if their iPhones automatically

28   downgraded to SMS every time an iMessage was not delivered.

1    Mr. Morris did not turn off iMessage before switching away from his iPhone 5.  (Cheung

2    Decl. ¶ 3, Ex. 2 at 227:16-18.)  He did not contact AppleCare — Apple's customer support — for

3    assistance when he discovered that he did not receive certain text messages.  (*Id.* at 229:2-

4    230:22.)  Mr. Morris does claim that he employed various strategies with his contacts whose text

5    messages he believes he did not receive, including asking them to delete existing message threads

6    and send their messages as SMS.  (*Id.* at 69:9-20.)  Mr. Morris produced purported screenshots of

7    texts that he alleges he did not receive.  Three of those screenshots were taken from his iPhone

8    (*id.* at 256:10-257:16) and therefore cannot support his claim; the balance of the screenshots he

9    identified do not prove his claim — indeed, he admits he does not know when they were taken

10   (*id.* at 258:4-14).  Mr. Morris also had other Apple devices (iPads) when he switched from an

11   iPhone to a non-Apple device.  (*Id.* at 78:1-82:5.)

12   Like the Backhauts, Mr. Morris does not have his iPhone anymore.  Nor does he have the

13   other Apple device (an iPad) he was using when he switched from his iPhone to a Samsung

14   phone.  (*Id.* at 46:2-18, 80:17-81:6, 182:1-12.)  In response to Apple's request, Mr. Morris

15   produced two devices for inspection: ███████████████████████████████████████

16   ██████████████████████████ Apple's digital forensics expert inspected Mr. Morris' devices

17   and determined that ████████████████████████████████████████████████

18   ████████████ (*See id.* ¶ 10, Ex. 9 at ¶ 5.) ████████████████████████

19   ████████████████ (*Id.*) ████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████

22   █████████████████████████████████ (*Id.* Ex. 9 at ¶¶ 28-30.) ████████████

23   ████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████ (*Id.* at ¶ 32.)

25

26

27

28

C.    **Apple's Intent:  Efforts to Improve iMessage and** 

       1.    **Apple's iMessage Deregistration Methods**

          a.    **Turning iMessage Off**

When Apple created iMessage, it designed the service so that users could freely and easily register and deregister.  (Wood Decl. ¶ 10.)  In fact, Apple wanted deregistration to be as simple as flipping a light switch.  As designed, a user could simply "toggle" his iPhone iMessage setting from "on" to "off."[6]  (*Id.*)  Apple also ***publicly*** announced on its website that users should turn off iMessage *before* switching to a non-Apple device.  (Declaration of Jeffrey Kohlman in Support of Defendant Apple Inc.'s Motion for Summary Judgment ("Kohlman Decl.") ¶ 3; Cheung Decl. ¶ 4, Ex. 3 at 41:21-42:18, 51:9-52:2, 75:7-76:24, 100:13-101:4.)  If a user did not turn off iMessage before switching, Apple's website advised that it could take up to 45 days for iMessage to automatically de-register a former iPhone user's telephone number (or email address) so that he could receive SMS/MMS text messages from a current iPhone user.  (Kohlman Decl. ¶ 3; Cheung Decl. ¶ 4, Ex. 3 at 101:8-102:4.)

          b.

---

[6]

1

           **c.**      **Apple's Auxiliary Deregistration Tools**

2

        After its launch in late 2011, ████████████████████ worked successfully

3

for years with relatively few exceptions (there are tens of millions of registered iMessage users).

4

Apple also supplemented ████████████ with additional tools.

5

     •   **The "1-1 Tool."**  In 2013, Apple launched the "1-1 tool," which enabled AppleCare

6

           representatives to deregister iMessage users upon request.  (Wood Decl. ¶ 13; Cheung

7

           Decl. ¶ 4, Ex. 3 at 41:21-42:25.)

8

     •   **The Self-Service Page.**  In November 2014, Apple launched a public-facing, self-

9

           service deregistration page.  (Kohlman Decl. ¶ 6; Cheung Decl. ¶ 4, Ex. 3 at 44:12-

10

           46:3.)  The webpage allows users to deregister their current or former iPhones from

11

           iMessage through a simple step-by-step process.  (Kohlman Decl. ¶ 6; Cheung Decl.

12

           ¶ 6, Ex. 5 at 95:25-96:14.)

13

           **d.** ██████████████████████████████████

14

████████████████████████████████████████████

15

████████████████████████████████████████████

16

████████████████████████████████████████████

17

████████████████████████████████████████████

18

████████████████████████████████████████████

19

████████████████████████████████████████████

20

████████████████████████████████████████████

21

████████████████████████████████████████████

22

████████████████████████████████████████████

23

████████████████████████████████████████████

24

████████████████████████████████████████████

25

███████████

26

████████████████████

27

████████████████████████████████████████████

28

████████████████████████████████████████████



**D.     Apple's Deregistration Methods Work**

Scores of former iPhone users were able to deregister from iMessages using these

methods:[7]

_____

[7] In July 2015, Apple conducted a voluntary consumer study using randomly selected participants to test whether iPhone/iMessage users could receive SMS messages after switching to a non-Apple device and deregistering from iMessage. (Cheung Decl. ¶ 15, Ex. 14 at ¶ 2-10.) Each participant was an android mobile phone user on one of the major carriers. (*Id.* Ex. 14 at ¶¶ 4-6.) None of the participants had ever used an iPhone. Apple asked each participant to temporarily switch his or her telephone number from the android device to an iPhone, receive an iMessage on the iPhone from a study administrator (who was also using an iPhone), and use one of Apple's available deregistration methods before or after switching back to the android device. (*Id.* Ex. 14 at ¶¶ 5-6.) The administrator — using the same iPhone used to send the iMessage — then sent another text-based message to the participant. (*Id.* Ex. 14 at ¶ 6.) In ***every single case*** — and regardless of the deregistration method used, the type of android device, and the carrier involved — the participant successfully received the second text message as an SMS on his or her android device. (*See* Cheung Decl. ¶¶ 16-23, Exs. 15-22.) Apple's multiple deregistration methods worked in precisely the type of scenario alleged in the FAC.

- **Turning iMessage Off Before Switching to A New Phone**:
    - ○ **Declarations of** ███████████████████████  Both Mr. ███████, who is a Sprint customer, and Ms. ███████, who is a T-Mobile customer, were able to successfully transition from an iMessage-enabled iPhone to an Android device (███████████████████████, respectively) and thereafter receive SMS texts from a continuing iMessage user.  (*See* Cheung Decl. ¶ 16, Ex. 15 at ¶¶ 3-9; *id*. ¶ 17, Ex. 16 at ¶¶ 3-9.)  Mr. ███████ transitioned from an iPhone 6 to a ███████ at approximately 7:50 p.m. on July 28, 2015.  (*Id.*  ¶ 16, Ex. 15 at ¶ 7.)  He turned iMessage off before he switched his service to the ███ phone.  (*Id.* Ex. 15 at ¶ 8.)  On July 29, 2015, at approximately 11:06 a.m., he received an SMS message from a continuing iPhone/iMessage correspondent.  (*See id.* Ex. 15 at ¶ 9.)
    - ○ Ms. ███████ transitioned from an iPhone 5c to a ███████ at approximately 7:00 p.m. on July 28, 2015.  (*Id.* ¶ 17, Ex. 16 at ¶ 7.)  She did exactly the same steps as Mr. ███████ and, like Mr. ███████ received an SMS message from a continuing iPhone/iMessage correspondent at approximately 11:11 a.m. on July 29, 2015. (*See id.* Ex. 16 at ¶¶ 8-9.)
- **Erasing Contents and Settings Before Switching to A New Phone**:
    - ○ **Declaration of** ██████████████  ██████████████, a T-Mobile customer, successfully transitioned from an iMessage-enabled iPhone to a ███████ phone.  (*See* Cheung Decl. ¶ 18, Ex. 17 at ¶¶ 3-9.)  He was able to receive SMS texts from a continuing iMessage user after the switch.  (*See id.* Ex. 17 at ¶ 9.)  Mr. ███████ switched from the iPhone to the ███████ at approximately 7:00 p.m. on July 28, 2015.  (*Id.* Ex. 17 at ¶ 7.)  Before switching phones, Mr. ███████ erased all of the contents and settings on the iPhone.  (*Id.* Ex. 17 at ¶ 8.)  On July 29, 2015, at approximately 8:18 a.m., he received an SMS message from a continuing iPhone/iMessage correspondent.  (*Id.* Ex. 17 at ¶ 9.)
- **Using Apple's Self-Service Webpage After Switching to A New Phone**:

1      o  **Declarations of** ██████████████████  Both ████

2      ████, a Sprint user, and ██████████, a T-Mobile user, were able to

3  successfully transition from an iMessage-enabled iPhone to another device and

4  thereafter receive SMS texts from a continuing iMessage user.  (*See* Cheung

5  Decl. ¶ 19, Ex. 18 at ¶¶ 3-9; *id.* ¶ 20, Ex. 19 at ¶¶ 3-9.)  Ms. ████ switched

6  from an iPhone 6 to a ██████████ at approximately 7:40 p.m. on July

7  28, 2015.  (*Id.* Ex. 18 at ¶ 7.)  After she switched to the ██████████

8  she visited Apple's online iMessage deregistration tool, located at

9  https://selfsolve.apple.com/deregister-imessage.  (*Id.* Ex. 18 at ¶ 8.)  She

10  followed the website's instructions and entered her phone number on the

11  webpage, received a text message containing a confirmation code, and entered

12  that code onto the webpage.  (*Id.*)  After using Apple's online deregistration

13  tool, on July 29, 2015, at approximately 11:01 a.m., she received an SMS

14  message from a continuing iPhone/iMessage correspondent.  (*See id.* Ex. 18 at

15  ¶ 9.)

16      o  Ms. ████ transitioned from an iPhone 5c to a ██████████

17  at approximately 7:00 p.m. on July 28, 2015.  (*Id.* ¶ 20, Ex. 19 at ¶ 7.)  She

18  performed exactly the same steps as Ms. ████ (including using Apple's

19  online iMessage deregistration tool to deregister from iMessage) and, like

20  Ms. ████ received an SMS message from an iPhone/iMessage

21  correspondent at approximately 11:14 a.m. on July 29, 2015.  (*See id.* Ex. 19 at

22  ¶¶ 8-9.)

23  • **Calling AppleCare After Switching to A New Phone**:

24      o  **Declarations of** ████████████████ ████

25  ██████████, who are T-Mobile users, were both able to

26  successfully transition from an iMessage-enabled iPhone to another device and

27  thereafter receive SMS texts from a continuing iMessage user.  (*See* Cheung

28  Decl. ¶ 21, Ex. 20 at ¶¶ 3-9; *id.* ¶ 22, Ex. 21 at ¶¶ 3-9.)  Ms. ████

1   transitioned from an iPhone 5c to a ███████████ at approximately 7:00

2   p.m. on July 28, 2015.  (*Id.* ¶ 21, Ex. 20 at ¶ 7.)  After she switched to the

3   ████████, she called the AppleCare support number (800-275-2273) and told

4   the AppleCare representative that she recently switched from an iPhone to a

5   non-Apple device, and wanted to deregister her phone number from iMessage.

6   (*Id.* Ex. 20 at ¶ 8.)  The representative indicated that her phone number would

7   be deregistered.  (*Id.*)  On July 29, 2015, at approximately 11:03 a.m., after

8   switching to the ████████ and calling AppleCare, she received an SMS

9   message from an iPhone/iMessage correspondent.  (*See id.* Ex. 20 at ¶ 9.)

10   ○   Mr. █████ transitioned from an iPhone 5c to a ███████████ at

11   approximately 6:40 p.m. on July 28, 2015.  (*Id.* ¶ 22, Ex, 21 at ¶ 7.)  He

12   performed exactly the same steps as Ms. ███████████ (*Id.* Ex. 21 at ¶¶ 6-9.)

13   Like Ms. ████████ on July 29, 2015, at approximately11:30 a.m., he

14   received an SMS message from an iPhone/iMessage correspondent.  (*See id.*

15   Ex. 21 at ¶ 9.)

16   •   ████████████████████████████████

17   ○   **Declaration of** ███████████████, a Verizon customer, was

18   able to successfully transition from an iMessage-enabled iPhone to another

19   device and thereafter receive SMS texts from a continuing iMessage user.  (*See*

20   Cheung Decl. ¶ 23, Ex. 22 at ¶¶ 3-9.)  Ms. ████████ transitioned from an iPhone

21   6 to a ███████████ at approximately 6:30 p.m. on July 28, 2015.  (*Id.* Ex.

22   22 at ¶ 7.)  She took no active steps to deregister from the iMessage service.

23   (*Id.* Ex. 22 at ¶ 8.)  On July 29, 2015, at approximately 11:32 a.m., she

24   received an SMS message from an iPhone/iMessage correspondent.  (*See id.*

25   Ex. 22 at ¶ 9.)

26

27

28

Apple's expert, Dr. John P.J. Kelly, also tested the various deregistration methods using devices subscribed to AT&T, and was able to successfully deregister from iMessage.[8]

- **Turning iMessage Off Before Switching to A New Phone:**
  - On July 26, 2015, at 9:30 p.m., Dr. Kelly sent and received an iMessage on an iPhone 5s subscribed to AT&T.  He then transitioned from the iPhone 5s to an Android device (HTC Desire 610) by switching the SIM card into the Android device.  Dr. Kelly turned off iMessage before he switched his service to the HTC phone.  On July 27, 2015, at 9:16 a.m., Dr. Kelly received an SMS text message on the HTC phone from the iPhone that previously sent the iMessage. (*See* Cheung Decl. ¶ 24, Ex. 23 at ¶¶ 15-16 & Ex. A at 16-20.)

- **Erasing Contents and Settings Before Switching to A New Phone:**
  - On July 26, 2015, at 10:48 a.m., Dr. Kelly sent and received an iMessage on an iPhone 5s subscribed to AT&T.  He then transitioned from the iPhone 5s to an Android device (HTC Desire 610) by switching the SIM card into the Android device.  Before switching phones, Dr. Kelly erased all of the contents and settings on the iPhone 5s.  On July 27, 2015, at 9:12 p.m., Dr. Kelly received an SMS text message on the HTC phone from the iPhone that previously sent the iMessage. (*See id*. Ex. 23 at ¶¶ 13-14 & Ex. A at 11-15.)

- **Using Apple's Self-Service Webpage After Switching to A New Phone:**
  - On July 27, 2015, at 6:43 p.m., Dr. Kelly sent and received an iMessage on an iPhone 5s subscribed to AT&T. He then transitioned from the iPhone 5s to an Android device (HTC Desire 610) by switching the SIM card into the Android

---

[8] Dr. Kelly tested the various ways of deregistering from iMessage using a standardized protocol.  He purchased two iPhone 5s devices, each of which was registered to AT&T. (*See id.* ¶ 24, Ex. 23 at ¶¶ 10-11.)  Both phones were reset to factory default settings. (*Id.* Ex. 23 at ¶ 11.) One of the iPhones ("iPhone A") sent an iMessage to the second iPhone ("iPhone B"). (*Id.* Ex. 23 at ¶¶ 12-24.)  After Dr. Kelly received the iMessage on iPhone B, he replied with an iMessage to iPhone A. (*Id.*)  Dr. Kelly then removed the SIM card from iPhone A, and placed it in the Android device he purchased, an HTC Desire 610. (*Id.*)  He followed one of Apple's available deregistration methods either before or after switching the SIM card to the HTC phone, depending on sequence called for by each method. (*Id.*)  Using each method, Dr. Kelly then received a text message on the HTC phone sent from iPhone B. (*Id.*)

device.  After Dr. Kelly switched to the HTC phone, he visited Apple's online iMessage deregistration tool, located at https://selfsolve.apple.com/deregister-imessage.  He followed the website's instructions and entered her phone number on the webpage, received a text message containing a confirmation code, and entered that code onto the webpage.  On July 28, 2015, at 7:13 a.m., Dr. Kelly received an SMS message from the iPhone that previously sent the iMessage.  (*See id*. Ex. 23 at ¶¶ 19-22 & Ex. A at 26-33.)

- ██████████████████████████████████████████

  o On July 28, 2015, at 8:22 a.m., Dr. Kelly sent and received an iMessage on an iPhone 5s subscribed to AT&T. He then transitioned from the iPhone 5s to an Android device (HTC Desire 610) by switching the SIM card into the Android device.  Dr. Kelly took no active steps to deregister from the iMessage service. On July 28, 2015, at 9:26 a.m., Dr. Kelly received an SMS message from the iPhone that previously sent the iMessage.  (*See id*. Ex. 23 at ¶¶ 21-22 & Ex. A at 34-38.)[9]

## III.   LEGAL STANDARD

"Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law." *Lasher v. City of Santa Clara*, No. 5:10-cv-04173-LHK, 2012 WL 381208, at *2 (N.D. Cal. Feb. 6, 2012) (citing Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986)).  A factual issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely

---

[9] Dr. Kelly was also able to deregister from iMessage using another simple method: removing the SIM card from the iPhone. (*Id*. Ex. 23 at ¶¶ 17-18.)  When the SIM card is removed from an iPhone that has Internet connectivity, the iPhone proactively deregisters the phone number from iMessage. (*Id*. at Ex. 23 at ¶ 17; Cheung Decl. ¶ 6, Ex. 5 at 134:6-21.)  When Dr. Kelly tested this method, the iPhone successfully deregistered and was able to receive text messages. (*Id*. Ex. 23 at ¶¶ 17-18.)

colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-250 (citations omitted).

"Once the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Lasher*, 2012 WL0381208, at *3 (quoting *Anderson*, 477 U.S. at 250). "A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *Fed. Trade Comm'n v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997). There is no "'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (citing *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996); *Johnson v. Wash. Metro. Transit Auth.*, 883 F.2d 125, 128 (D.C. Cir. 1989)).

## IV.    ARGUMENT

### A.    Apple Is Entitled to Summary Judgment on Plaintiffs' Wiretap Act Claim

#### 1.    Plaintiffs Cannot Establish An "Interception" Under The Wiretap Act

Plaintiffs must prove that Apple intentionally "intercepted" their electronic communications. 18 U.S.C. §§ 2510(4), 2511(1)(a).

##### a.    "Intercept" Is Narrowly Defined

"Intercept" is narrowly defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 877 (9th Cir. 2002).

##### b.    No Acquisition

Plaintiffs must identify the messages they did not receive. They must also show that *Apple* "intercepted" those messages. Just because Plaintiffs did not *receive* a message does not mean that Apple "*intercepted*" it.

Plaintiffs cannot identify any specific undelivered "intercepted" text messages; as a result, they cannot show that any messages were acquired by Apple. Neither Mr. Backhaut nor Mr. Morris has any admissible evidence of the messages they claim were sent to them but that

they did not receive.[10]  Unfortunately, neither Mr. Backhaut nor Mr. Morris kept his iPhone, and

████████████████████████████████████████████████████████████████

Mr. Backhaut and Mr. Morris cannot prove that they did not receive a given text message, and

Apple has been precluded from showing that the allegedly "undelivered" text messages were

either never sent in the first place or were actually successfully delivered.  Most telling is the

Backhaut's actions:  *Months* after they filed this action, ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████

Identifying the actual, specific communications that were "acquired" or "intercepted" by

Apple is critical evidence for Plaintiffs' claims; otherwise, any alleged "interception" is purely

*speculative*.  Apple is aware of no Wiretap Act case that survived summary judgment where the

plaintiff was unable to identify the actual communications that were allegedly intercepted.

### c.     No Acquisition During Transmission

### (1)     In Transit

The acquisition must occur at the *time* of transmission or while the communication is "in

flight," not while it is in electronic storage.  *Konop*, 302 F.3d at 877; *Theofel v. Farey-Jones*,

359 F.3d 1066, 1077 (9th Cir. 2003) (holding that the Wiretap Act "applies only to 'acquisition

contemporaneous with transmission'"); *see also Glob. Policy Partners, LLC v. Yessin*, 686 F.

Supp. 2d 631, 638 (E.D. Va. 2009) (holding that an interception can take place only if it occurs

"at some point between the time the communication is sent and the time it is received");

*Bunnell v. Motion Picture Ass'n of Am.*, 567 F. Supp. 2d 1148, 1152 (C.D. Cal. 2007).

But iMessage does not intercept messages when they are "in flight"; quite the contrary, it

puts messages in flight.

When an iMessage user sends a text, iMessage will select one of two delivery avenues

depending exclusively on whether the recipient's address (phone number) is registered with

---

[10] As noted above, although Mr. Morris produced purported screenshots of texts he alleges he did not receive, several are from *his own* phone and therefore cannot be texts he did not receive.  The others were taken on unknown dates and cannot be tied to any message Apple "acquired."

1    iMessage.  If it is registered, the text is sent through iMessage.  If not, the text is delivered as an

2    SMS.

3          Plaintiffs do not allege that iMessage "intercepts" SMS messages sent through the

4    SMS/MMS delivery avenue using the wireless carriers' architecture.  SMS/MMS need not be

5    considered further.

6          Instead, Plaintiffs seem to allege that Apple intercepts text messages while they are in

7    transit over Apple's proprietary iMessage system.[11]  Apple does not intercept messages; it tries to

8    deliver them.  iMessage tries to send the text message to the recipient's last known iMessage

9    address; it does not intercept it.  If the text message cannot be delivered to the last known address

10    (for whatever reason), ███████████████████████████████████████

11    ████████████████████████████████████████████  *See Hall v.*

12    *EarthLink Network, Inc.*, 396 F.3d 500, 502-05 (2d Cir. 2005) (finding no Wiretap Act violation

13    where EarthLink merely continued to receive and store email messages sent to the plaintiff's

14    closed "@earthlink.net" email account by third parties); *Ideal Aerosmith, Inc. v. Acutronic USA,*

15    *Inc.*, No. 07-1029, 2007 WL 4394447, at *5 (E.D. Pa. Dec. 13, 2007) (finding no Wiretap Act

16    violation where defendant "employed no device to acquire [certain] e-mails, but was merely, as

17    owner of [the email] system, a direct party to the communication").

18          Plaintiffs' case is not about interception or acquisition of text messages; it is about the

19    delay in updating current delivery addresses.  The possibility of that delay is publicly disclosed on

20    Apple's website and can be caused by a whole host of things — ██████████████████

21    ██████████.  Because the text messages that Plaintiffs claim were intercepted during

22    transit were actually in the process of being delivered on the iMessage system, the Wiretap Act

23    does not apply here.

                          **(2)**    **In Storage**

25    ██████████████████████████████████████████████

26    ██████████████████████████████, that is not a contemporaneous acquisition

27    ─────────────────────

28        [11] *See Backhaut v. Apple, Inc.*, ---F. Supp. 3d---, No. 14-CV-02285-LHK, 2014 WL
6601776, at *6 (N.D. Cal. Nov. 19, 2014).

1  either. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See, e.g.*, *Theofel*, 359 F.3d at 1077-78; *Bunnell*, 567 F. Supp. 2d

3  at 1153-54.  Although courts have not uniformly enforced the distinction between transmission

4  and storage, the Ninth Circuit has concluded that acquiring electronic communications while they

5  are stored on a device or server — even if only for a fleeting moment while en route to another

6  location — is not an actionable interception under the Wiretap Act:

> Email and other electronic communications are stored at various
> junctures in various computers between the time the sender types
> the message and the recipient reads it.  In addition, the transmission
> time of email is very short because it travels across the wires at the
> speed of light.  It is therefore argued that if the term "intercept"
> does not apply to the ***en route storage of electronic
> communications***, the Wiretap Act's prohibition against
> "intercepting" electronic communications would have virtually no
> effect. While this argument is not without appeal, ***the language and
> structure of the ECPA demonstrate that Congress considered and
> rejected this argument***.  Congress defined "electronic storage" as
> "any temporary, intermediate storage of a wire or electronic
> communication incidental to the electronic transmission thereof,"
> 18 U.S.C. § 2510(17)(A), indicating that Congress understood that
> electronic storage was an inherent part of electronic
> communication.  Nevertheless, as discussed above, Congress chose
> to afford stored electronic communications less protection than
> other forms of communication.

17  *Konop*, 302 F.3d at 878 n.6 (emphasis added).  In any event, ▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### d.      No Acquisition of the *Contents* of Any Text Messages

24      Plaintiffs cannot show that Apple acquired the ***contents*** of any text messages. The

25  Wiretap Act applies only to interceptions of the "contents" of communications.  18 U.S.C.

26  § 2510(4).  "Contents" means "any information concerning the substance, purport, or meaning of

27  that communication."  *Id.* § 2510(8).  It "does not include record information regarding the

28  characteristics of the message that is generated in the course of the communication."  *In re Zynga*

1    *Privacy Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). ███████████████████████

2    ████████████████████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████ (Wood Decl.

4    ¶ 7.) ████████████████████████████████████████████████████ (*See*

5    *id.* ¶¶ 6-7.)  That information — ████████████████████ — is precisely the type of non-

6    substantive information excluded from the Act.  *See United States v. Reed*, 575 F.3d 900, 917 (9th

7    Cir. 2009).

8            It is undisputed that Apple did not and does not access the contents of any message sent

9    via iMessage.  Indeed, Apple *could not* access message contents.  Apple clearly advises iMessage

10   users that the "*contents*" of messages sent via iMessage "are protected by end-to-end encryption[12]

11   so no one but the sender and receiver can access them.  *Apple cannot decrypt the data.*"  (Cheung

12   Decl. ¶ 14, Ex. 13 (emphasis added)).

13           Plaintiffs' expert, Dr. Meldal, admitted that he has no reason to believe Apple has any

14   way to decrypt the contents of iMessages.  (Cheung Decl. ¶ 11, Ex. 10 at 202:22-25.)  In fact,

15   Apple can only evaluate the credentials used to transmit messages across its system.  The access

16   credentials are decidedly *not* message content under the Wiretap Act.  *See, e.g.*, *Reed*, 575 F.3d at

17   917; *see also In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1061 (N.D. Cal. 2012)

18   (holding that information that does not comprise the "substance, purport, or meaning" of a

19   communication is not covered by the Wiretap Act).  When it drafted the Wiretap Act, Congress

20   did not intend liability for a defendant who designs an alleged *method of interception* of

21   communications but makes it impossible to access to the *content* of the communications.

### 2.      Apple Did Not Use A "Device" To "Intercept" Electronic Communications

24           The Wiretap Act defines "device" as "any device or apparatus which can be used to

25   intercept a wire, oral, or electronic communication."  18 U.S.C. § 2510(5).  The Wiretap Act's

26   definition of "device" specifically *excludes*:

27   _____

28           [12] *See* footnote 1.

1

> (a) any telephone or telegraph instrument, equipment or facility, or
> any component thereof, (i) furnished to the subscriber or user by a
> provider of wire or electronic communication service in the
> ordinary course of its business and being used by the subscriber or
> user in the ordinary course of its business…; or (2) being used by a
> provider of wire or electronic communication service in the
> ordinary course of its business . . . .

18 U.S.C. § 2510(5)(a).  The ordinary course of business exception protects "electronic communication service providers against a finding of liability under the Wiretap Act where the interception facilitated or was incidental to provision of the electronic communication service at issue."  *In re Google Inc. Gmail Litig.*, No. 13-MD-02430-LHK, 2013 WL 5423918, *11 (N.D. Cal. Sept. 26, 2013).

After a full year of discovery, six depositions, and thousands of produced documents, Plaintiffs still have not identified the "device" Apple allegedly used to "intercept" messages.  In fact, the only "devices" identified in this action so far are the "instruments" and "equipment" that Apple uses to *transmit* iMessages in the ordinary course of its business.  *See id.* at *8. *See In re Google, Inc. Privacy Policy Litig.*, No. C 12-01382 PSG, 2012 WL 6738343, at *5-6 (N.D. Cal. Dec. 28, 2012).  Plaintiffs object to the iMessage system of delivering text messages.  The gravamen of their complaint is that the iMessage application continued to send text messages to them through the iMessage system after they switched to a new, non-Apple phone.  The Apple devices identified through discovery are: ███████████████████████████████ ███████████  Each of these "devices" is integral to the operation of iMessage and the transmission of messages in the ordinary course of business.  (*See* Wood Decl. ¶¶ 6-9.)  Each of these "devices" is expressly excluded from the Act.

The ordinary course of business exception does not hinge on the successful transmission of the communication to the intended recipient.  *See Hall*, 396 F.3d at 502.  Apple used its own equipment to relay messages that iPhone users attempted to send via iMessage.  All iMessages — irrespective of who sent them — were sent the same way using the same equipment and systems.  Ultimately, ████████████████████████████████████████████████████████ ████████████████████████████████████  But Apple did attempt to deliver those

1   messages through its own proprietary system.  The ordinary course of business exception

2   squarely applies to such circumstances.  *See id.* at 505 (If electronic communication service

3   providers were not covered by the "ordinary course of business exception," they "would

4   constantly be intercepting communications under [the Wiretap Act] because their basic services

5   involve the 'acquisition of the contents' of electronic communication.  Congress could not have

6   intended this absurd result.").

7   ### 3.   No Intentional Interception

8        Apple did not "intentionally" intercept messages destined for Plaintiffs.  Because they

9   cannot identify a single specific message that Apple allegedly intercepted, Plaintiffs simply

10  cannot show that Apple *intended* to intercept any given text message.  Equally importantly,

11  Apple's affirmative evidence shows that Apple (1) took steps and developed methods that

12  ensured that each iMessage user's status was accurate and current so that messages could be

13  properly routed through iMessage or SMS and (2) published these deregistration methods so that

14  iMessage users knew how to deregister.  Apple's actions are the *opposite* of the intent to intercept

15  messages; Apple was working to see that messages were properly delivered.

16  ### a.   Apple Created iMessage Deregistration Tools

17       Apple offered iMessage users tools to deregister from iMessage when they switched to

18  another manufacturer's phone.  Specifically:

19  

25      (Wood Decl. ¶ 12; Cheung Decl. ¶ 6, Ex. 5 at

26  86:18-87:14, 98:25-99:24.)

27  - **Erase Contents and Settings.**  Apple enabled iPhone users to deregister from

28  iMessage ***and continue to receive text messages sent by iPhone users*** by erasing all

contents and settings on their device.  (Cheung Decl. ¶ 6, Ex. 5 at 96:21-24, 198:21-199:12.)

- **Turn iMessage off Before Switching.**  Apple instructed users to deregister from iMessage *and continue to receive text messages sent by iPhone users* by toggling off iMessage on their phones before switching to a non-Apple device. (*Id.* ¶ 6, Ex. 5 at 96:21-97:14; *id.* ¶ 4, Ex. 3 at 41:21-42:18, 44:15-45:5, 51:9-52:2, 75:7-76:24, 100:13-101:4.)

- **Call AppleCare (toll free)**.  Apple created a tool for AppleCare representatives to deregister phone numbers from iMessage at a user's request so that the user could *continue to receive text messages sent by iPhone users*.  (Wood Decl. ¶ 13; Cheung Decl. ¶ 4, Ex. 3 at 43:1-11.)  Apple also worked to ensure that calls customers placed to cellular carriers about this issue were forwarded to AppleCare representatives, who then deregistered customers.  (Cheung Decl. ¶ 4, Ex. 3 at 41:21-42:25.)

- ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████ (*Id.*; Cheung Decl. ¶ 5, Ex. 4 at 37:14-24; Cheung Decl. ¶ 6, Ex. 5 at 133:16-23.)

- **Self-Deregistration Through the Apple Website.**  In November 2014, Apple released a public-facing, self-service deregistration page.  (Kohlman Decl. ¶ 6; Cheung Decl. ¶ 4, Ex. 3 at 44:12-46:3.)  This webpage allows users to deregister their current or former iPhone from iMessage through a simple process so that they can *continue to receive text messages from iPhone users*.  (Kohlman Decl. ¶ 6; Cheung Decl. ¶ 6, Ex. 5 at 95:25-96:14.)

- Apple continues its ongoing efforts to improve its products and services, including improvements to iMessage.

1

**b.    The Deregistration Methods Work**

2    Apple's deregistration tools work.  Apple's expert, Dr. John P.J. Kelly, tested each of the

3    methods.  His declaration details his success in deregistering from iMessage using each of these

4    methods.  But, because the deregistration tools are meant for non-experts, as well, Apple has also

5    submitted declarations from eight consumers who tested each of these methods.  Each was able to

6    successfully deregister using these methods.  The methods worked with all of the android phones

7    in the survey.  The methods worked with each of the wireless carriers (all four major carriers

8    were tested).

9    •   **Erase Contents and Settings**: ██████████ was able to deregister from

10       iMessage and transition from an iPhone to a ██████ by erasing the content and

11       settings on the iPhone.  Less than 24 hours after switching, he received a

12       confirmatory SMS from an iPhone/iMessage user.  (Cheung Decl. ¶ 18, Ex. 17 at

13       ¶¶ 3-9 [using T-Mobile and switching to ██████.)  Dr. Kelly also received a text

14       message after using this deregistration method and switching his phone number

15       from an iPhone to an Android device.  (*See id*. ¶ 24, Ex. 23 at ¶¶ 13-14.)

16    •   **Turn iMessage Off Before Switching**. ████████████████ were

17       able to deregister from iMessage using this method.  They received a confirmatory

18       SMS text from an iPhone/iMessage user.  (*Id*. ¶ 16, Ex. 15 at ¶¶ 3-9 [using Sprint

19       and switching to ████████ *id*. ¶ 17, Ex. 16 at ¶¶ 3-9 [using T-Mobile and

20       switching to ████████  Dr. Kelly also received a text message after using this

21       deregistration method and switching his phone number from an iPhone to an

22       Android device.  (*See id*. ¶ 24, Ex. 23 at ¶¶ 15-16.)

23    •   **Call AppleCare (toll free).** ████████████████ were able to

24       deregister from iMessage and transition from an iPhone to a ████████████

25       and a ████████ respectively, using this method.  They both received a

26       confirmatory text message from an iPhone/iMessage user.  (*Id*. ¶ 21, Ex. 20 at ¶¶

27       3-9 [using T-Mobile and switching to ████████████ *id*. ¶ 22, Ex. 21 at ¶¶

28       3-9 [using T-Mobile and switching to ████████

1    • ████████████████████████████ had to do nothing!  She was able to

2    deregister from iMessage and transition from an iPhone to a ████████ using

3    this method (she simply waited till the ████████████████ kicked in and

4    she was automatically deregistered by Apple).  She received a confirmatory text

5    message from an iPhone/iMessage user.  (*Id*. ¶ 23, Ex. 22 at ¶¶ 3-9 [using Verizon

6    and switching to ████████████]  Dr. Kelly also received a text message after

7    switching his phone number from an iPhone to an Android device and taking no

8    active steps to deregister from iMessage.  (*See id*. ¶ 24, Ex. 23 at ¶¶ 21-22.)

9    • **Self-Deregistration Through the Apple Website**.  ████████████████████

10   ████████ were able to deregister from iMessage and transition from an iPhone to a

11   ████████████ and a ████████████████, respectively, using this

12   method.  They both received a confirmatory text message from an

13   iPhone/iMessage user.  (*Id*. ¶ 19, Ex. 18 at ¶¶ 3-9 [using Sprint and switching to

14   ████████████ *id*. ¶ 20, Ex. 19 at ¶¶ 3-9 [using T-Mobile and switching to

15   ████████████████  Dr. Kelly also received a text message after using

16   this switching his phone number from an iPhone to an Android device and using

17   this deregistration method.  (*See id*. ¶ 24, Ex. 23 at ¶¶ 19-20.)

18   Deregistration was completed with each of the four major wireless service providers,

19   AT&T, Sprint, T-Mobile and Verizon.  (*See id*. ¶ 16, Ex. 15 at ¶¶ 3-9 [Sprint]; ¶ 17, Ex. 16 at ¶¶

20   3-9 [T-Mobile]; ¶ 18, Ex. 17 at ¶¶ 3-9 [T-Mobile]; ¶ 19, Ex. 18 at ¶¶ 3-9 [Sprint]; ¶ 20, Ex. 19 at

21   ¶¶ 3-9 [T-Mobile]; ¶ 21, Ex. 20 at ¶¶ 3-9 [T-Mobile]; ¶ 22, Ex. 21 at ¶¶ 3-9 [T-Mobile]; ¶ 23, Ex.

22   22 at ¶¶ 3-9 [Verizon]; ¶ 24, Ex. 23 at ¶¶ 11 [AT&T].)

23   If a text message was not delivered, it was in spite of, not because of, Apple's efforts.  █

24   ██████████████████████████████████████████████████████████

25   ████████  (Wood Decl. ¶¶ 14-16.)

26   Even if there were other causes for the failed delivery of a particular text message, there is

27   simply no evidence that Apple *intended* to prevent text messages from being delivered, especially

28   as Apple was working continuously to improve the iMessage deregistration process.  There is no

1   liability under the Wiretap Act for acts or consequences that resulted from inadvertence, mistake,

2   or even gross negligence.  *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 742-43 (4th Cir. 1994)

3   (alleged interception due to unknown design defect insufficient to establish intent under Wiretap

4   Act); *In re Pharmatrak, Inc. Privacy Litig.*, 292 F. Supp. 2d 263, 267-68 (D. Mass. 2003); *Loucks*

5   *v. Ill. Inst. Of Tech.*, No. 12 C 4148, 2012 WL 5921147, at *2 (N.D. Ill. Nov. 20, 2012).

6   **B.      Apple Is Entitled To Summary Judgment on Plaintiffs' Entirely Derivative**
         **UCL Claim**

7

8       Plaintiffs' remaining claim under the UCL is derivative of their claim under the Wiretap

9   Act.  *Glenn K. Jackson, Inc. v. Roe*, 273 F.3d 1192, 1203 (9th Cir. 2001) (affirming summary

10  judgment on derivative UCL claim); *Marr v. Bank of Am.*, No. C 09-05978 WHA, 2011 WL

11  845914, at *10 (N.D. Cal. Mar. 8, 2011) (granting summary judgment in favor of defendant on

12  plaintiff's UCL claim "to the extent that judgment has been granted or reserved as to the other

13  originating claims").

14  **C.      Apple's iOS Software License Agreement Bars Each of Plaintiffs' Claims**

15      Even if Plaintiffs could prove their Wiretap Act and unfair competition claims — which

16  they cannot — Apple is entitled to summary judgment on its First Affirmative Defense (Waiver,

17  Acquiescence, and Estoppel) because Plaintiffs explicitly relinquished their claims when they

18  agreed to the terms of the iOS Software License Agreement.  (*See* Defendant Apple Inc.'s

19  Answer to First Amended Class Action Complaint at 10, Dkt. No. 31.)  There are two key

20  disclaimers in the License Agreement.

21  **1.      No Warranty of Compatibility; No Warranty That the Software and**
         **Services Will Be "Error Free."**

22      The License Agreement specifically addresses compatibility issues and the risk of

23  software bugs and other potential software defects:

24              APPLE DOES NOT WARRANT AGAINST INTERFERENCE
            WITH YOUR ENJOYMENT OF THE iOS SOFTWARE AND
25          SERVICES, THAT THE FUNCTIONS CONTAINED IN OR
            SERVICES PERFORMED BY THE iOS SOFTWARE WILL
26          MEET YOUR REQUIREMENTS, THAT THE OPERATION OF
            THE    iOS    SOFTWARE    AND    SERVICES    WILL    BE
27          UNINTERRUPTED OR ERROR-FREE, . . . THAT DEFECTS IN
            THE iOS SOFTWARE OR SERVICES WILL BE CORRECTED,
28          OR THAT THE iOS SOFTWARE WILL COMPATIBLE OR

1
2
3

WORK    WITH    ANY    THIRD    PARTY    SOFTWARE,
APPLICATIONS    OR    THIRD    PARTY    SERVICES.
INSTALLATION OF THIS SOFTWARE MAY AFFECT THE
USABILITY OF THIRD PARTY SOFTWARE, APPLICATIONS
OR THIRD PARTY SERVICES.

4

(Cheung Decl. ¶ 12, Ex. 11 at Exs. A-D § 7.4.)

5

6

### 2.    Limitation of Liability.

7

The iOS Software License Agreement also contains a limitation of liability clause that

8

covers the types of claims Plaintiffs bring here.  It states that, to the extent permitted by law:

9
10
11
12

IN NO EVENT SHALL APPLE BE LIABLE FOR …*FAILURE
TO TRANSMIT OR RECEIVE ANY DATA* . . . ARISING OUT
OF OR RELATED TO YOUR USE OF OR INABILITY TO USE
THE iOS SOFTWARE AND SERVICES OR ANY THIRD
PARTY SOFTWARE OR APPLICATIONS IN CONJUNCTION
WITH    THE    iOS    SOFTWARE,    HOWEVER    CAUSED,
*REGARDLESS OF THE THEORY OF LIABILITY* . . . .

13

(*Id*. ¶ 12, Ex. 11 at Exs. A-D § 8.)

14

Apple did not warrant that Plaintiffs would receive any messages or that their iOS

15

experience would be error-free.  By agreeing to the License Agreement, Plaintiffs specifically

16

waived any claim arising from their use of the software.

17

### 3.    Provisions Survive Post-Termination.

18

Plaintiffs filed this suit in May 2014.  Their relationship with Apple continued to be

19

governed by the *surviving* terms of the License Agreement.  (*Id*. ¶ 12, Ex. 11 at Exs. A-D § 6

20

(providing that disclaimer of warranties and limitation of liability provisions "shall survive any

21

such termination").)

22

## V.    CONCLUSION

23

There is no genuine dispute as to any material fact.  Apple is entitled to judgment as a

24

matter of law on Plaintiffs' remaining causes of action under the Wiretap Act and UCL.  For all

25

the foregoing reasons, Apple's motion for summary judgment should be granted.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: August 7, 2015

DAVID M. WALSH
TIFFANY CHEUNG
KAI S. BARTOLOMEO
MORRISON & FOERSTER LLP


By: */s/ David M. Walsh*
        DAVID M. WALSH

        Attorneys for Defendant
        APPLE INC.